AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20) ☐ Original ☐ Duplicate Origin

**FILED**
CLERK, U.S. DISTRICT COURT

1/28/2022

CENTRAL DISTRICT OF CALIFORNIA
BY Velisia Munroe DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

**LODGED**
CLERK, U.S. DISTRICT COURT

1/28/2022

CENTRAL DISTRICT OF CALIFORNIA
BY: VIB DEPUTY

|  |  |
|---|---|
| United States of America<br><br>v.<br><br>SILVERIO COLLAZO and CARLOS PACO,<br><br>Defendants | Case No.   2:22-mj-00385-DUTY |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of January 27, 2022 in the county of Los Angeles in the Central District of California, the

defendants violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute Controlled Substances |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/ Jared Blevens*
*Complainant's signature*

_____
Jared Blevens, DEA Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:          1/28/22          _____
*Judge's signature*

City and state:   Los Angeles, California          Hon. Charles Eick, U.S. Magistrate Judge
*Printed name and title*

AUSA: Julia Hu (x3802)

**AFFIDAVIT**

I, Jared Blevens, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a criminal complaint against SILVERIO COLLAZO ("CALLAZO") and CARLOS PACO ("PACO") for violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.

2.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

3.   I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7).  I am empowered to conduct investigations of, and to make arrests for, federal felony offenses enumerated in 18 U.S.C. § 2516.

4.   I am a Special Agent ("SA") of the Drug Enforcement Administration ("DEA") and have been so employed since January 2020.  I am currently assigned to the Los Angeles Field Division ("LAFD"), Riverside District Office ("RDO"), in Riverside, California, and my responsibilities include investigating large-

1

scale drug trafficking organizations operating in the Southern California area and elsewhere.

5.   During the course of my employment, I have received approximately 300 hours of specialized training at the DEA Academy in Quantico, Virginia, on drug identification, detection, and interdiction, money laundering techniques, conspiracy investigations, and asset identification, seizure, and forfeiture.  During the academy, I was also trained on wire and electronic interceptions and the use of wire and electronic interception equipment.  I am certified by the California State Attorney General's Office in the practical, technical, and legal aspects of court-ordered wiretaps per California Penal Code Section 629 et seq.

6.   I have participated in numerous drug investigations, which have included the use of confidential sources and undercover officers, physical surveillance, electronic surveillance, the execution of search and arrest warrants, dialed number recorders (pen registers), telephone toll analysis, the arrests of drug traffickers, and the analysis of seized records, physical evidence, and taped conversations. Over the course of my employment as a law enforcement officer, I have participated in investigations that involve one or all of the following crimes: possession, distribution, possession with intent to distribute, and manufacture of controlled substances. I have assisted in the execution of multiple search warrants and have spoken with defendants, confidential informants, and other witnesses who have extensive knowledge of large-scale narcotics

trafficking organizations.  In addition, I have spoken with other experienced narcotics investigators concerning the methods and practices of drug traffickers.  I have also reviewed electronically intercepted communications and consulted with other law enforcement and legal personnel regarding the legal bases for the application and use of wire interceptions.

7.    Based on my training and experience, my conversations with other law enforcement personnel, and my own participation in this investigation, I have become familiar with the criminal activities of individuals involved in drug trafficking organizations, including drug manufacturing, drug distribution, and money laundering.  I am also aware of the tactics and methods employed by such individuals to avoid detection by law enforcement, including the use of multiple wireless telephones, pre-paid cellular telephones, cloned communication devices, debit calling cards, public pay telephones, counter-surveillance techniques, false or fictitious identities, coded and ambiguous language in conversations, multiple vehicles, and vehicles with concealed compartments.  I am aware that drug traffickers drop or switch telephones and/or telephone numbers frequently to thwart law enforcement investigation of their criminal activities.  I am further aware that drug traffickers use wireless telephones subscribed in the names of other individuals, often times their spouses or other family members, to avoid law enforcement detection.  Based on my training and experience, I have found that it is common for narcotics traffickers to obtain, maintain, and use firearms in order to

protect their narcotics and narcotics proceeds and that the cell phones they use have high call volume from a variety of telephone numbers.

### III. <u>**SUMMARY OF PROBABLE CAUSE**</u>

8.   In August 2021, a federal grand jury returned an indictment charging ANTHONY XAVIER CHAVEZ ("CHAVEZ") with three counts of distribution of or possession with intent to distribute fentanyl.  Case No. CR 21-404-SB.  Those charges arose from three transactions on July 15, July 3, and August 12, 2021, in which CHAVEZ sold me, acting in an undercover capacity, thousands of counterfeit Oxycodone pills containing fentanyl.

9.   During surveillance of CHAVEZ on the day of the August 12 transaction, DEA agents observed two individuals later identified as COLLAZO and PACO meet with CHAVEZ in the lobby of his apartment building and enter CHAVEZ's apartment unit. COLLAZO was wearing a backpack and carrying a satchel.  A federal search warrant was executed later that day, during which agents found in CHAVEZ's apartment approximately 4.35 kilograms of suspected counterfeit Oxycodone pills containing approximately 1.12 kilograms of fentanyl, fentanyl powder, and multiple cell phones.  A search of CHAVEZ's phone showed messages between CHAVEZ and COLLAZO in which CHAVEZ arranged to buy drugs from COLLAZO.

10.   Since November 2021, the Orange County Sheriff's Department ("OCSD") has been investigating J.S. and COLLAZO for drug trafficking.  Snapchat messages between J.S. and COLLAZO include conversations in which COLLAZO directs J.S. to come to

821 E Oaks St., Compton, California (the "EAST OAKS RESIDENCE")
to pick up drugs.  GPS tracking data of J.S.'s car shows that
J.S. has visited the EAST OAKS RESIDENCE on at least nine
separate occasions between December 2021 and January 2022.

11.  On January 12, 2022, J.S. was stopped by OCSD
Investigators shortly after GPS tracking data showed that J.S.
had gone to the EAST OAKS RESIDENCE.  J.S. had in his front
sweatshirt pocket a bag containing 100 counterfeit Oxycodone
pills.  J.S. admitted that he had purchased the pills for $240
from a contact with COLLAZO's phone number.

12.  On January 25, 2022, I obtained federal warrants
signed by United States Magistrate Judge Jacqueline Chooljian to
search the EAST OAKS RESIDENCE as well as a Gray Alfa Romeo
Giulia associated with COLLAZO ("ALFA ROMEO").  Nos. 22-MJ-317 &
22-MJ-318.

13.  On January 27, 2022, I, along with a team of DEA
agents and OSCD officers, executed the search warrants.  COLLAZO
and PACO were both in the EAST OAKS RESIDENCE.  In total, we
found approximately 4,000 suspected counterfeit oxycodone pills
containing fentanyl, approximately 164 grams of a white
substance that field tested presumptively positive for cocaine,
and approximately 9 grams of suspected fentanyl powder, as well
as three firearms.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

14.  Based on my review of law enforcement reports,
conversations with other law enforcement agents, and my own
knowledge of the investigation, I am aware of the following:

**A.   Investigation and Indictment of ANTHONY XAVIER CHAVEZ for Distribution of Fentanyl**

15.   On August 27, 2021, a federal grand jury in the Central District of California returned an indictment charging CHAVEZ with three counts of distribution of or possession with intent to distribute fentanyl, in violation of 21 U.S.C. § 841. Case No. CR 21-404-SB.   Those charges arose out of three transactions in which CHAVEZ, believing me to be a purchaser of drugs, sold me fentanyl in exchange for payment on July 15, July 30, and August 12, 2021.

16.   Prior to each of these transactions, I communicated with CHAVEZ over phone and text message via the phone number (323) 448-6935 to set up the transactions.

17.   After the first two transactions, I obtained a federal search warrant signed by United States Magistrate Judge Shashi H. Kewelramani for CHAVEZ's residence, which is an apartment unit inside an apartment building located at 3033 Wilshire Blvd, Apt 610, Los Angeles, California.   No. 5:21-MJ-521.   CHAVEZ was observed by DEA agents returning to this apartment unit during surveillance after the transactions between CHAVEZ and me on July 15 and July 30, 2021.

18.   I set up a third transaction with CHAVEZ to take place on August 12, 2021.   I told CHAVEZ that I wanted to purchase approximately 10,000 counterfeit Oxycodone pills from him for $50,000.   CHAVEZ agreed to sell me 10,000 pills and added, "I'm going to front you a couple."   Based on my training and experience, I understood this to mean that CHAVEZ would "front"

or loan me several thousand pills in addition to the 10,000 that I had requested that I would pay for at a later date.

19.   On August 12, 2021, DEA agents set up surveillance of CHAVEZ's apartment building prior to our arranged meeting time. At approximately 1:00 p.m., the DEA agents saw two Hispanic males, later identified as COLLAZO and PACO, meeting with CHAVEZ in the lobby of the apartment building.   COLLAZO was wearing a backpack and carrying a satchel.

20.   Shortly thereafter, COLLAZO, PACO, and CHAVEZ entered CHAVEZ's apartment unit.   COLLAZO and PACO left the apartment unit.   At approximately 1:08 p.m., COLLAZO and PACO were observed leaving the apartment building, getting into the ALFA ROMEO, and driving away.

21.   Shortly after COLLAZO and PACO left CHAVEZ's apartment, I spoke to CHAVEZ on the phone.   CHAVEZ said that he was waiting for "the ones [he was] supposed to front," or loan to, me.   Based on our conversation, the agents' observations of COLLAZO, wearing a backpack and carrying a satchel, and PACO entering CHAVEZ's apartment shortly before our arranged meeting time, and my training and experience, I believe that COLLAZO and PACO were potentially sources of supply of drugs for CHAVEZ.

22.   DEA agents then conducted a knock and announce to execute the search warrant of CHAVEZ's residence.   Upon entry, DEA agents apprehended CHAVEZ and another individual.   A third individual jumped off the balcony and was subsequently apprehended.

23.   At the same time, a DEA agent saw approximately 15,000 counterfeit Oxycodone pills wrapped in cellophane, which lab results confirmed contained approximately 1.12 kilograms of fentanyl, on the sidewalk outside of CHAVEZ's apartment.  This package is believed to have been tossed from the apartment as law enforcement made entry to execute the warrant.

24.   In CHAVEZ's apartment, DEA agents additionally found and seized approximately 4.35 kilograms of suspected counterfeit Oxycodone pills divided into multiple Ziploc/plastic bags, 1.1 kilograms of suspected fentanyl powder in a vacuum sealed bag, as well as eight cell phones.

**B.   Communications Between CHAVEZ and COLLAZO**

25.   I obtained a federal search warrant signed by United States Magistrate Judge Jacqueline Chooljian to search the phones seized from CHAVEZ's apartment on August 12, 2021.  No. 21-MJ-3770.  Based on the iCloud accounts tied to the phones and photographs on the phones, it was determined that three of the phones belonged to CHAVEZ.

26.   In particular, a gray iPhone with serial number S001417279, was identified as linked to the (323) 448-6935 phone number that CHAVEZ had been using to communicate with me to set up the transactions charged in the indictment.

27.   Pursuant to the federal search warrant, I sent the phones seized on August 12, 2021 for forensic analysis.  During my review of the forensic analysis results of CHAVEZ's phone tied to the (323) 448-6935 number, I saw text messages between CHAVEZ and telephone number (559) 205-5977.

28.   On September 15, 2021, Task Force Officer Mike Callahan received subpoena results from the service provider for (559) 205-5977, which showed that the number was subscribed to COLLAZO with an address of record listed as the EAST OAKS RESIDENCE.  The (559) 205-5977 number was saved as "Paco" in CHAVEZ's phone.  A search of open-source databases showed a woman with maiden name Paco and initials A.P. whom I believed at the time to be COLLAZO's mother, was also associated with the address of the EAST OAKS RESIDENCE.

29.   The text messages between CHAVEZ and COLLAZO on CHAVEZ's phone included the following:

a.   In or about July 2021, CHAVEZ asked COLLAZO to "front me a boat please."  Based on my training and experience, I know that "boat" refers to a quantity of 1,000 narcotics pills and "front" means to loan.  In other words, CHAVEZ was asking COLLAZO to loan him 1,000 pills, which CHAVEZ would later pay COLLAZO for.

b.   In or about July 2021, COLLAZO sent CHAVEZ a video of a brick of a white substance.  I recognized the substance to be cocaine based on its shape, size, texture, and color.  Based on my training and experience, the brick appeared to weigh about a kilogram.  CHAVEZ responded to the video that COLLAZO sent that he needed one.  COLLAZO responded that he was getting them for "25."  Based on my training and experience, I inferred that COLLAZO was buying a kilogram of cocaine for $25,000.

C.    **Investigation of J.S. and COLLAZO**

30.   On or about December 29, 2021, I became aware of an investigation being conducted by the Orange County Sheriff's Department ("OCSD") into an individual with initials J.S., after speaking to Investigator Matt Leflore.

31.   During the course of their investigation, the OSCD identified J.S. as a source of supply for counterfeit Oxycodone pills being sold in Orange County.  In or about November 2021, OSCD officers obtained state search warrants signed by Orange County Superior Court Judge Margaret Anderson for GPS tracking of J.S.'s car (a Kia SUV, which is registered to J.S. in the California DMV system), J.S.'s Snapchat account activity, and J.S.'s person and residence located at 2366 Sullivan, Irvine, California.  On or about December 27, 2021, OSCD officers got a 30-day extension of the GPS tracker warrant.

32.   Using an undercover Snapchat account, OSCD officers saw that a Snapchat account with username "lowkeyj420," was posting photographs and messages of drugs for sale.  Based on my training and experience, I am aware that drug traffickers commonly use Snapchat to set up drug transactions because they believe the content from Snapchat is gone once the messages are played in the app and therefore that they can avoid detection.

33.   The Snapchat account with username "lowkeyj420" is registered to phone number (714) 715-9805.  According to subscriber information for that number, it belongs to J.S. Additionally, Snapchat account activity for that account includes posts of photographs of J.S. and J.S.'s car.

34.   Review of J.S.'s Snapchat account activity showed that J.S. was in communication with an account with username "eeemon1017."  The username "eeemon1017" is registered to the (559) 205-5977 number associated with COLLAZO.  The messages between J.S. and COLLAZO include the following:

a.    In or about June 2021, COLLAZO provides the address for the EAST OAKS RESIDENCE to J.S.

b.    On the following day after providing the address, J.S. tells COLLAZO that he could "sell the Ms" as a "boat." Based on my training and experience, I understood "Ms" to be a reference to "M-30," which is the typical physical marking on Oxycodone pills, as well as slang for counterfeit Oxycodone. Again, "boat" references a quantity of 1,000 pills.

35.   Pursuant to the state search warrant, OSCD officers installed a GPS tracker on J.S.'s car, a Kia SUV registered to him in the California DMV system, on or about November 30, 2021.

36.   GPS tracking data showed that J.S. traveled to the EAST OAKS RESIDENCE, usually between the hours of 11:00 p.m. to 2:00 a.m., on or about December 15, December 21, December 24, December 25, December 26, 2021 and January 7, January 12, January 18, and January 20, 2022.

37.   On or about January 12, 2022, at approximately 8:00 p.m., the GPS tracker on J.S.'s car showed that it was headed north from Orange County to Los Angeles County.  Based on J.S.'s previous activity, it appeared that J.S. was again traveling to the EAST OAKS RESIDENCE.

38.   At approximately 8:50 p.m., the GPS tracker showed that J.S.'s car arrived at the EAST OAKS RESIDENCE and left shortly after.  The GPS tracker did not show that J.S. made any other stops.

39.   At approximately 9:30 p.m., OSCD Investigators Leflore and Estes stopped J.S.'s car for failing to stop at a red light, in violation of California Vehicle Code § 21453(a).  J.S. pulled over in front of a gas station located at 13980 Seal Beach Boulevard, Seal Beach, California.

40.   During the traffic stop, Investigator Estes saw a bag of pills in plain view in the front pocket of J.S.'s sweatshirt. Later, during a recorded Mirandized interview, J.S. confirmed that he had gone to EAST OAKS RESIDENCE that day and purchased 100 oxycodone pills for $240.  J.S. also confirmed that the contact with telephone number (559) 205-5977 was his source for pills.

41.   J.S. had on his person a purple Apple iPhone.  J.S. gave OSCD Investigator Leflore consent to look at messages concerning his source of supply for the drugs he was stopped with that evening.  J.S. directed OSCD Investigator Leflore to open an app called Telegram.  Based on my training and experience and my conversations with Investigator Leflore, Telegram is commonly used by drug traffickers to conduct drug transactions because it is encrypted end-to-end, which makes it difficult for law enforcement to intercept messages.

42.   J.S. directed Investigator Leflore to open up a message thread on the Telegram app with an individual named

"Pops."  J.S. told Investigator Leflore that "Pops" was the guy that J.S. gets his pills from.  The phone number in the message thread is the (559) 205-5977 number associated with COLLAZO.

43.   Investigator Leflore took a video recording as he scrolled through the Telegram message thread.  The message thread between J.S. and COLLAZO contained at least two months of messages.  During their conversations, J.S. and COLLAZO set up over a dozen meetings in which J.S. would buy pills or cocaine from COLLAZO.  The conversations included the following:

        a.   J.S. and COLLAZO would discuss a quantity and price for each transaction.

        b.   For the meeting location for the majority of the transactions, COLLAZO would tell J.S. "you know where to go" or "come to the house."  Based on the fact that COLLAZO had earlier given J.S. the address of the EAST OAKS RESIDENCE in a Snapchat message, I believe COLLAZO was likely referring to the EAST OAKS RESIDENCE.  For some of the transactions, COLLAZO would select a different meeting location and provide J.S. with an address.

        c.   When J.S. arrived at the EAST OAKS RESIDENCE, he would message COLLAZO "I'm here."  COLLAZO would respond that he was coming out.

        d.   The dates and times of the Telegram messages setting up the transactions between J.S. and COLLAZO at the EAST OAKS RESIDENCE are consistent with J.S.'s GPS tracking data showing him going to the EAST OAKS RESIDENCE.

        e.   On or about January 12, 2022, the day that J.S. was stopped, J.S. texted COLLAZO around 8:19 p.m. that he was

"otw."  Based on my training and experience and the GPS tracking data, I understood J.S. to be telling COLLAZO that he was "on the way" to the EAST OAKS RESIDENCE.  At 8:51 p.m., J.S. texted COLLAZO that "here, G," which, based on the GPS tracking data, I understood to mean that J.S. had arrived at the EAST OAKS RESIDENCE.  COLLAZO replied OK.  At 9:00 p.m., J.S. told COLLAZO, "sending the Zelle now."  Zelle is an electronic payment service.  At 9:06PM, J.S. told COLLAZO, "sent. $240." COLLAZO confirmed receipt of payment.  J.S.'s text message is consistent with his statement to law enforcement that he paid $240 for the 100 pills of counterfeit Oxycodone.

44.  On or about December 25, 2021, J.S. sent COLLAZO a photograph of blue pills on a digital scale.  Based on the "M-30" marking on the pills and my training and experience, I recognized the pills to potentially be counterfeit oxycodone pills.  J.S. asked COLLAZO about the weight, which the scale showed was 106 grams, and why it was not 110 grams.  COLLAZO responded that the weight can be anywhere between 105 to 111 grams.  Based on my training and experience, I interpreted this conversation as a dispute about the amount of pills that J.S. had bought from COLLAZO.

45.  On or about December 27, 2021, Investigator Leflore spoke to an individual named W.P.  W.P. explained that he buys counterfeit oxycodone pills from J.S.  According to W.P., he knew that J.S. got his pills from a Hispanic Male in the Compton area and would deliver them to W.P.  The EAST OAKS RESIDENCE is located in Compton, California.

D.   **Investigation of the EAST OAKS RESIDENCE and the ALFA ROMEO**

46.   Based on a search of records from the California DMV, I learned that COLLAZO reported the EAST OAKS RESIDENCE as his residence.  COLLAZO's driver license photo matches the individual wearing a backpack and carrying a satchel that met with CHAVEZ on August 12, 2021.

47.   I also learned from California DMV records that the ALFA ROMEO is registered to A.P. at the EAST OAKS RESIDENCE. Based on my training and experience, I know that it is common for drug traffickers to register their cars in other people's names to avoid detection by law enforcement.

48.   DEA agents observed the ALFA ROMEO parked at CHAVEZ's apartment building prior to the execution of the search warrant on August 12, 2021.  DEA agents observed COLLAZO drive away in the ALFA ROMEO.

49.   OSCD officers have seen the ALFA ROMEO parked at the EAST OAKS RESIDENCE during surveillance on at least three separate occasions in December 2021 and January 2022.

50.   On or about January 17, 2022, OSCD investigators installed a pole camera near the EAST OAKS RESIDENCE.  Footage from that pole camera shows COLLAZO driving away in and returning to the EAST OAKS RESIDENCE in the ALFA ROMEO on a daily basis.

51.   J.S.'s Snapchat account messages also contained a photograph from October 21, 2021 of the ALFA ROMEO parked in the driveway of the EAST OAKS RESIDENCE.  The photograph had the

caption "How you know I trap" with a timestamp of 10:52 a.m.
October 21, 2021, and geolocation stamp of "Compton."  Based on
my training and experience, I recognize the slang term of "trap"
as a verb with a meaning related to dealing drugs.  "Trap" can
also be used as a slang term to refer to a location of a house
dedicated to dealing drugs.

**E.    Search of the EAST OAKS RESIDENCE, Seizure of Drugs
and Firearms, and Arrest of COLLAZO and PACO on
January 27, 2022**

52.  On January 25, 2022, I obtained federal warrants
signed by United States Magistrate Judge Jacqueline Chooljian to
search the EAST OAKS RESIDENCE and the ALFA ROMEO.  Case Nos.
22-MJ-317 & 22-MJ-318.

53.  On January 27, 2022, members of RDO and OCSD executed
the search warrants at the EAST OAKS RESIDENCE.  There were six
adults and two children present while the search warrants were
being executed.  Two of the adults were COLLAZO and PACO.  I
recognized PACO as the second male seen with COLLAZO at CHAVEZ's
apartment on August 12, 2021.  The other adults who reside at
the EAST OAKS RESIDENCE and who were present were A.P., whom I
had initially suspected was COLLAZO's mother but is actually
PACO's mother; A.R., who is married to A.P. and is PACO's
stepfather; and J.A., PACO's girlfriend.  C.P., PACO's sister,
was also present but does not live at the residence.  Two minor
children, ages 5 and 1, also live at the residence.

54.  Agents searched the bedroom belonging to COLLAZO, as
evidenced by items in COLLAZO's name in the room, including
COLLAZO's wallet which contained his driver's license.  In

addition to his identification, I also know this to be COLLAZO's room because guns that were registered to him were in the room, and he directed me to grab his sweatshirt and shoes for him from the room.  On a shelf in a closet inside COLLAZO's room, agents found a plastic bag containing approximately 1,000 blue pills marked with "M-30."  Based on my training and experience and my knowledge of this investigation, I recognize these pills to likely be counterfeit Oxycodone pills containing fentanyl.  The pills have been sent to a lab for analysis, the results of which are pending.

55.  In COLLAZO's room, agents also found a total of approximately twelve individual plastic baggies with a combined weight of approximately 154 grams containing a white substance that field tested presumptively positive for cocaine.  Two of the bags were found on the same shelf as the suspected counterfeit M-30 pills, and ten additional bags were found in a metal tin on top of a Rubbermaid plastic drawer set in the same closet.  Based on my training and experience, I recognize the separate bagging of cocaine as a common technique for drug distribution.  In addition to the suspected cocaine in COLLAZO's room, I discovered an additional two baggies with a combined weight of approximately nine grams of a substance that field tested presumptively positive for fentanyl.  Agents also found two digital scales.

56.  Agents also found three firearms and various rounds of ammunition in COLLAZO's room:

     a.   A Smith & Wesson AR-style rifle, bearing serial number TS04853, in a shelf in a closet in COLLAZO's room.  Next to the rifle was the bag of approximately 1,000 pills and several high-capacity magazines, one of which was loaded with live ammunition.

     b.   A Smith & Wesson handgun, bearing serial number FCX5156, in a satchel hanging on COLLAZO's door, loaded with seven rounds of ammunition.

     c.   A Smith & Wesson revolver, bearing serial number DMD5195, in the closet next to the rifle and drugs, loaded with five rounds of ammunition.

57.  A search of law enforcement databases showed that the AR rifle and handgun were both registered to COLLAZO, and the revolver was unregistered.

58.  Agents searched the bedroom belonging to PACO, as evidenced by items in PACO's name in the room, including his passport, prescription medication, and a criminal case citation document pertaining to his recent arrest for carrying a loaded handgun without registration.  In a dresser drawer in PACO's room, agents found two small baggies with a total combined weight of approximately ten grams which field tested presumptively positive for cocaine hydrochloride.  Also in the same dresser drawer were PACO's passport and approximately $4,500 in cash.  The cash consisted mostly of stacks of $100 bills with a few loose bills in various denominations.  The bedroom also contained a baby crib for PACO's child.

59.   Agents also searched the garage attached to the house. Although there is no entry from the house directly into the garage, there is a flip door for the garage as well as a door in the back.   In the garage, agents found approximately 3,000 pills and at least one digital scale.   The pills were separated into three separate packages of approximately 1,000 pills each and were concealed within metal cylinders that were hidden in a box that was hidden in a bag in the garage.   Based on my training and experience, I recognized the cylinders as a technique used by large-scale drug traffickers to transport illegal narcotics. Specifically, traffickers will hide narcotics inside of fire extinguisher cylinders in order to disguise the true contents of the metal container and to thwart law enforcement.   I recognized the pills as consistent with the size, color, and markings of the counterfeit Oxycodone purchased and seized from CHAVEZ, as well as in other drug cases I have worked.

**F.   Mirandized Interview of COLLAZO**

60.   Following the seizure of drugs and guns, I and Task Force Officer Michael Callahan interviewed COLLAZO.

61.   After advising COLLAZO of his Miranda rights, he agreed to speak with us.   I asked COLLAZO about CHAVEZ, and COLLAZO confirmed that he had gone to CHAVEZ's apartment with his nephew, PACO, and admitted that he had driven the ALFA ROMEO there, on August 12, 2021.

62.   I asked COLLAZO about the cocaine that was found in the house, and he told me that an individual in jail has a daughter "that gave the bird to my nephew," PACO.   Based on my

training and experience, I recognize the term "bird" as a reference to cocaine.  COLLAZO proceeded to explain that PACO asked if he would be able to do him a favor and find customers for the cocaine.

63.  I asked COLLAZO about the approximately 1,000 pills and guns that were found in his bedroom.  COLLAZO acknowledged that each of the guns and the pills were in his room.  With respect to the pills, COLLAZO explained that "I'm just holding it for my nephew."

64.  COLLAZO explained that he takes orders from his nephew, PACO.  COLLAZO said that PACO gives him directions such as, "you're going to serve a jar" and then COLLAZO meets with the customer and completes the deal.  Based on my training and experience, I recognize the term "jar" as referring to a quantity of 100 pills.

65.  When I asked COLLAZO about pills, quantities, and prices, he told me that a boat, a known quantity of 1,000 pills, goes for approximately $1,000.  In addition to the pills and cocaine, two additional baggies of powder that tested presumptively positive for fentanyl were found within the closet of COLLAZO's bedroom.

//

//

## V.  <u>CONCLUSION</u>

66.  For all of the reasons described above, there is probable cause to believe that COLLAZO and PACO have violated 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this <u>28TH</u> day of
January, 2022.

_____
THE HONORABLE CHARLES F. EICK
UNITED STATES MAGISTRATE JUDGE